Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 8 - all | **DATE** | 7/10/2002 |
| **CASE TITLE** | USA vs. Lorenzo Funches, Carlos DeJesus Munoz, Juan Toro | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motions to quash and suppress are all granted. (28-1, 29-1, 29-2, 34-2, 34-2, 36-1, 39-1, 39-2) This action is set for a status hearing at 1:15 p.m. July 18, 2002 to discuss the posture of the case and any further proceedings. To that end, 18 U.S.C. 3161(h)(8)(a) and (b)(iv) call for the exclusion of time under the Act through that date. (XT, XT4) The time from April 15, 2002 through today is excludable under 18:3161(h)(1)(F). (XE)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | JUL 11 2002 date docketed | 55 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | 7/10/2002 date mailed notice | |
| SN | courtroom deputy's initials | Date/time received in central Clerk's Office | SN mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
          Plaintiff, )
)
v. ) No. 02 CR 8
)
LORENZO FUNCHES, CARLOS DeJESUS )
MUNOZ and JUAN TORO, ) **DOCKETED**
)
          Defendants. ) JUL 1 1 2002

MEMORANDUM OPINION AND ORDER

After the motions filed by defendants Lorenzo Funches ("Funches"), Carlos Munoz ("Munoz") and Juan Toro ("Toro") to quash their arrests and suppress the evidence obtained in conjunction with those arrests had reached the fully briefed stage, this Court concluded--and defense counsel and government counsel all agreed--that an evidentiary hearing was required to address the controverted issues. That hearing was then conducted on April 15, 2002,[1] and the parties have tendered their post-hearing submissions as directed by this Court. For the reasons stated in this memorandum opinion and order, defendants' motions are granted.

First, however, just a word should be said about the Speedy Trial Act ("Act") time clock. This Court has earlier ruled that the post-April-15 hearing period should be excluded for Speedy Trial purposes under 18 U.S.C. §3161(h)(1)(F)("Subsection

---

[1] All "Tr. --" references are to that evidentiary hearing.

(1)(F)")--an open-ended exclusion. Then the last briefs were filed on May 3, when Munoz and Toro submitted their replies to the government's post-hearing supplemental citation of authority. Time since then has been occupied with working through the numerous briefs and all the parties' cited authorities as applicable (or inapplicable) to the evidentiary record.

Under all of the circumstances, this Court views the current resolution of the pending motions as conforming to the "other prompt disposition" alternative under Subsection (1)(F). If the government or any defendant has a different perception of the matter, a brief memorandum explaining the reason for that different view must be filed in this Court's chambers on or before July 24, 2002--otherwise the full exclusion of time through today's date will apply under that subsection.

Now to the merits (or lack of merit) of the motions. To begin with, no credence whatever can be given to the government's efforts to ascribe any significance to the information assertedly received from a confidential informant several months before the operative events now at issue. That prior information was described in this fashion at page 2 of the government's March 15, 2002 Consolidated Response to Defendants' Pre-trial Motions (and has been advanced repeatedly by the government since then, as though such repetition could lend force to an absurdity):

> DEA agents received information from a confidential
> source in August 2001 that an unidentified Colombian

2

male was involved in the smuggling of cocaine and
heroin into the United States from Cali, Colombia. The
confidential source told the DEA that the Colombian
trafficker uses a residence at 7412 N. Western Avenue,
Chicago, to store the narcotics, which he distributes
using several Chicago area drug dealers. Based upon
this information, on January 2, 2002, agents of the DEA
established a surveillance at 7412 N. Western Avenue.
7412 N. Western is an apartment building consisting of
three floors.

To assert that as probable cause (or even as the prelude to probable cause) for the agents tailing a vehicle that left from that building on January 2 with two Hispanic males--a driver and a passenger--since identified as Toro and Munoz--simply does not pass the straight-face test. Indeed, the March 15 Consolidated Response went on to say at page 6:

It is true the agents did not have a description of the
man, did not know in which apartment the man was
living, and had never had any contact with, or any
specific information regarding Toro, Funches or Munoz
prior to January 2, 2002. None of this matters,
however, given the observations made by the agents on
January 2, 2002.[2]

All of that being so, why do government counsel mention that months-old "tip" at all? Lawyers who make such groundless arguments should be wary, lest their total lack of force may

---

[2] [Footnote by this Court] It should further be noted that there was also no suggestion whatever that the apartment building as such was a drug house regularly (or even sporadically) used for transactions involving controlled substances. So even if the confidential informant's story were to be credited as reliable (something that the government has not sought to bolster at all), there was no reason whatever to believe that the occupants of other apartments were anything other than people attending to their own fully legitimate activities.

spill over to taint what might otherwise be other arguments that deserve some degree of respect.

To return to the contemporaneous evidence, what it discloses is that on January 2 DEA agents observed a Hispanic male entering the apartment building from an automobile registered to that address, then shortly thereafter leaving with another Hispanic male in the same car. Yet the agents followed those men (who ultimately turned out to be Toro and Munoz) for no apparent reason (except perhaps as a matter of racial profiling--after all, the two men were Hispanics). That tailing led to what the agents must have viewed as a highly suspicious destination--an International House of Pancakes restaurant in nearby Evanston, where the two men obtained a bag that the agents concluded contained food (!) and then returned to the 7412 N. Western building.

Nothing daunted, the agents waited and, later that afternoon, saw Toro and Munoz leave the building again and proceed to another apparently suspect destination--a dry cleaning store. Passenger Munoz went into and came out of the store a couple of times after having talked with someone inside--and although the agents have sought to attach some suspicions to that activity, the evidence is devoid of any connection between that store (or its personnel) and any illegal activity of any kind.

Next the Toro-Munoz vehicle was followed by the DEA

4

surveillance team to a parking lot of a Dominick's store near Foster and Sheridan Avenues in Chicago. At that point Toro walked over to another vehicle, driven by an African-American male later identified as Funches, while Munoz moved over to the driver's seat in the first vehicle.

Now the plot thickens somewhat. Both cars drove to a location about a mile away, from which Munoz drove off, leaving the Funches vehicle (with Toro as a passenger) parked. Next a Hispanic woman walked out of the apartment building to which Munoz had driven and handed Munoz a gray shopping bag[3] that she had carried from the building, and Munoz then returned in his car to the location where Funches and Toro had parked. Some five minutes later Toro got out of the Funches vehicle carrying a gold-colored shopping bag, which he placed in the Munoz car, at the same time taking the gray shopping bag back to the Funches car in which he had been sitting. Then Toro walked back to the car that he and Munoz had originally occupied.

At that point the DEA team drew their guns and arrested all three of the current defendants. There is a divergence in the agents' testimony in that respect:

    1. DEA Special Agent Christine McCoy ("McCoy"), who was the team leader, testified that she called out for the

---

[3] Sometimes that bag is referred to in the evidence as gray, sometimes as silver. This opinion will use the former description.

arrest as soon as she saw the just-described movement of the shopping bags (Tr. 17-18). In her version, it was not until _after_ she had given the arrest order that she saw, in assertedly plain view (as she would have it, lying on top of the wide open gray shopping bag--Tr. 43-44), what later turned out to be a one-kilo brick of cocaine.

    2. By contrast, Task Force Officer Robert Hatch ("Hatch") testified that Agent McCoy's first communication about arresting defendants was to say "I see drugs in the car. Place handcuffs on the guy--that guy" (Tr. 94).

    3. Like Officer Hatch, DEA Special Agent Chet Oberling ("Oberling") identified the arrest as having taken place after "Special Agent McCoy said she had seen the dope on the front seat" (Tr. 113).

This Court credits McCoy's version--she was the one who actually gave the arrest order, rather than having heard it broadcast (and hence was obviously best equipped to recall the sequence of events).

For the government's part, although it has refrained from taking a specific position on the issue, the thrust of its contentions really amounts to a disavowal of Agent McCoy's version in favor of the other officers'. Thus it has subscribed to the position that the presence of the cocaine "brick" in assertedly open view justified defendants' arrest even if the

agents did not have probable cause for such an arrest when they initially approached the vehicles--here is page 8 of the government's Consolidated Response:

> In the present case, all three of the defendants chose a public alley for their deal, transacted the deal in public view, and defendant Funches placed one of the "bricks" of cocaine in plain view on the front console of the car he was driving. Therefore, even assuming, arguendo, the agents had neither probable cause for arrest when they initially approached the vehicle, or, further, that they did not even have an articulable suspicion that there was criminal activity afoot, so as to warrant an investigatory Terry stop, the warrantless arrests of the three are still valid under the plain view doctrine.

Despite their just-described differences as to the timing of the arrest (which, as later discussion reflects, is important to the outcome), all three agents agreed on the notion that Funches--who had two kilo packages of cocaine inside a shopping bag that also contained two windbreakers, something obviously intended to make the bag look innocuous to anyone who chanced to see it--nevertheless took one of those packages out of the bag and placed it in plain view somewhere on the front seat of the car. Although all three testifying officers thus subscribed to the "plain view" characterization of that kilo of cocaine, their characterizations differed from each other:

    1. As already indicated, Agent McCoy's version had the cocaine located inside but on top of the gray shopping bag (Tr. 43-45):

        Q: Where in relation to this silver

7

shopping bag was this rectangular-shaped object?

A: The bag was open and it was on top of the bag, inside the bag. The bag was wide open, and it was laying right there on top.

THE COURT: When you say the bag was open, you mean it was open upright?

THE WITNESS: Yes. The top of the bag was, yes.

THE COURT: How big a bag was this in depth?

THE WITNESS: About a foot and a half, two feet, plastic shopping bag.

BY MR. MILLER:

Q: The object that you saw, this rectangular-shaped object, it's your testimony that was on top of the bag?

A: It was sitting on the seat open and it was resting on top of that.

Q: It was not resting on the front seat of the Altima?

A: The front passenger's seat.

THE COURT: Wait a minute. When you say it was on top of it, you mean that it was in the bag and on top or was it outside of the bag?

THE WITNESS: Can I show you?

THE COURT: Is that a depiction of how it was?

THE WITNESS: Yes.

THE COURT: When it was first seen? All right. Let's take a look.

THE WITNESS: Here is the passenger seat.

The bag --

BY MR. MILLER: Can we ask you to wait one second, please? May I step up, please?

THE COURT: Yes. Now you've described an open --

THE WITNESS: This is it right here (indicating).

MR. BEUKE: Go ahead.

THE COURT: You've described an open bag?

THE WITNESS: On the seat.

THE COURT: A foot and a half, two feet high. So it's like this. Okay? And you said that this content -- or I shouldn't say that, that the brick-shaped object--was on top of the bag?

THE WITNESS: Right.

THE COURT: Now if the bag is upright, I assume it's got an opening at the top, right?

THE WITNESS: Yes.

THE COURT: So you are saying that it was on top of the contents that were in the bag?

THE WITNESS: It's like the bag was open. Like here is the bag and it's laying on top. The bag is open.

THE COURT: A plastic bag -- a soft plastic bag?

THE WITNESS: But it's laying on the seat. It's sitting on the seat.

THE COURT: Okay.

BY MR. MILLER:

Q: The rectangular object, then, itself

9

was not touching the passenger's seat?

A: Correct.

2. By contrast, Agent Oberling testified that he "saw the rectangular package lying on the front seat" and that "it was lying against the gray bag in the vehicle on the front seat" (Tr. 113).

3. As for the DEA report on the arrest, it was described as having said "that Special Agent McCoy approached the Nissan and observed what appeared to be a kilogram-shaped package of cocaine in plain view <u>on the passenger's seat</u> of the Nissan" (Tr. 46, emphasis added). And Officer McCoy acknowledged on cross-examination (<u>id</u>.) that there was no report consistent with her "on top of the bag" version.

In summary, no other report was consistent with Agent McCoy's version as given during the hearing.[4]

This Court--having listened to the testimony and observed the witnesses' demeanor--discredits the testimony of the several agents about there having been <u>any</u> drugs in plain view on the front seat of the car.[5] Instead this Court deems it far more

---

[4] See Appendix.

[5] In light of this rejection of the agents' "plain view" testimony, there is no need to buy into defendants' contention that an agent's observation of a brick-size wrapped package does not perforce promote a reasonable suspicion (one that exists before such observation) to the status of probable cause. On

10

probable, and accordingly finds, that from the outside of the car nothing was observable either in the gray shopping bag (with the possible exception of the clothing that it is uncontroverted was in the bag--two windbreaker jackets) or on the car seat itself. It is admitted by the agents that the jackets covered--that is, concealed--a second kilogram of cocaine, and this Court finds that in fact *both* kilogram packages were out of plain view, being effectively concealed by the clothing.[6]

---

that score defendants have invoked this sentence from <u>United States v. Cardona-Rivera</u>, 904 F.2d 1149, 1154 (7th Cir. 1990):

> [A] wrapped brick of cocaine does not necessarily proclaim its contents so unequivocally as to justify a search without a warrant.

But in doing so defendants have not told the whole story, for they fail to go on to quote the very next sentence from that opinion (<u>id</u>.):

> But given everything else the officers knew, the sighting of a package that looked a great deal like a package of cocaine gave them probable cause to arrest Cardona and seize the package.

All of that, however, is beside the mark, for the totally different evidentiary equation in this case renders any such analysis moot.

[6] Discrediting the testimony of government agents is not something that this Court takes lightly. Yet during the voir dire process of jury selection that precedes every criminal trial, this Court says essentially this to the venire:

> Let me emphasize that no greater or lesser weight is to be given to a witness' testimony because he or she is with the government. Does that idea--that you are not to believe a federal agent or police officer or other governmental employee any more or less than any other person by reason of the office the governmental

Although the government seeks alternatively to claim "[t]here was probable cause to arrest the defendants at the time their cars were stopped" (Government's Supplemental Authority at 1), the very cases that it cites for that proposition--<u>United States v. Zabala</u>, 52 F.Supp.2d 377 (S.D. N.Y. 1999), <u>United States v. Perea</u>, 848 F.Supp. 1101 (E.D. N.Y. 1994), <u>United States v. Tussa</u>, 816 F.2d 58 (2d Cir. 1987) and <u>Minnesota v. Hawkins</u>, 622 N.W.2d 576 (Minn. 2001)--really demonstrate just the opposite. Each of those cases had far more pieces of potentially incriminating structure in place before the agents permissibly filled in the gaps with reasonable inferences.

By contrast, what the agents had at the time of the arrests here was no more than suspicion. They unquestionably began following defendants out of sheer suspicion (a suspicion that demonstrated nothing more than an inherently suspicious mindset or worse on the agents' part, for it had nothing to support it), and that suspicion continued to exist throughout their surveillance. It may be assumed for present purposes to have

---

>   employee occupies--give you any difficulty in following
>   the rules that I've stated? Would any of you have any
>   difficulty in treating the testimony of such a
>   person--a federal agent or a police officer--with
>   exactly the same standard as any other witness, a
>   private person?

No different rule should, of course, apply to a bench hearing. In this instance this Court has given careful consideration to the testimony of every witness, and what is said in the text reflects its determination of witness credibility.

12

grown to reach the level of reasonable suspicion by the time of the arrests,[7] for Agent McCoy (whose version is credited for this purpose) plainly pulled the figurative trigger by ordering defendants' arrest <u>before</u> that suspicion had elevated to probable cause through the purported sighting of the brick of cocaine at some location on the car's front seat or thereabouts.

Little wonder, then, that Officer Hatch (expressly) and Agent Oberling (impliedly) came up with versions different from Agent McCoy's--versions under which she issued the arrest order only <u>after</u> she had purportedly seen the drugs in open view. That portrayal on their part, sharply at odds with Agent McCoy's testimony at Tr. 17-18, must be viewed as their recognition of major concerns on the "probable cause" issue. As Part II of the government's Supplemental Authority memorandum at 4 states the proposition:

> The agents had reasonable suspicion to stop the vehicles (which ripened to probable cause when Agent Cris McCoy saw the drugs in plain view).

With this Court having discredited the several agents' testimony as to one of the cocaine bricks having been in plain view (as contrasted with both bricks having been concealed by the

---

[7] Defendants dispute that, pointing out for example that just a week after Christmas the exchange of shopping bags could have had the innocuous appearance to an unbiased onlooker of an exchange of gifts. As just indicated in the text, it is unnecessary to accept any such approach to reach the findings and conclusions expressed here.

13

clothing--the two windbreakers--in the gray shopping bag), probable cause for the warrantless arrests has consequently been negated. And Agent McCoy's precipitate action in having caused defendants' arrest before the agents' suspicion (even reasonable suspicion) did ripen into probable cause makes it impossible to reconstruct the scenario as to what would have taken place if the law enforcement people had instead limited their activities at that point to a <u>Terry</u> stop. Hence it would be irresponsible (really impermissible) to attempt to salvage the searches and seizures, as they actually took place, by hypothesizing some kind of "what if" construct.

Finally, the government's arguments as to defendants' asserted lack of standing (arguments to which both Toro and Munoz have responded) were made on assumptions that this opinion has rejected. Those objections are accordingly rebuffed, although the standing issue may perhaps be revisited if the government were hereafter to advance persuasive authority that is properly applicable to the now-existing context.

What follows from what has been said up to now is that the warrantless seizure of the cocaine (contained in the gray bag) and the currency (contained in the gold bag) is invalidated. Munoz also seeks suppression of his post-arrest inculpatory statement as fruit of the poisoned tree--of the invalid arrest (see, e.g., <u>Lanier v. South Carolina</u>, 474 U.S. 25 (1985)(per

14

curiam))--and that motion too is granted.

No seizure of the two vehicles was sought to be separately justified by the government, so that the seizure of narcotics and a handgun found during the ensuing claimed "inventory searches" would also appear to fall under the Wong Sun doctrine. Finally, although the parties have not separately addressed the search warrant for the safety deposit boxes maintained by Funches at the Uptown National Bank, the agents learned about them only from a business card in Funches possession that was obtained in the booking process after Funches' invalid arrest. Hence it would appear that the government's obtaining of nearly $500,000 from drilling the two boxes is similarly tainted as well.

This action is set for a status hearing at 1:15 p.m. July 18, 2002 to discuss the posture of the case and any further proceedings. To that end, 18 U.S.C. §3161(h)(8)(a) and (b)(iv) call for the exclusion of time under the Act through that date.

                                          */s/ Milton I. Shadur*
                                      Milton I. Shadur
                                      Senior United States District Judge

Date: July 10, 2002

Appendix

Although Funches did not testify during the hearing, his prehearing Reply to Government's Consolidated Response included his affidavit, submitted under the penalties of perjury, in which he swore:

> 1. That on January 2, 2002 I was driving a Nissan Altima, a vehicle that belonged to my niece.
>
> 2. That some time after 3 p.m. on that date a person now known to me as Juan Toro placed a shopping bag on the front seat of that vehicle. The only thing inside that bag that was visible were two jackets.
>
> 3. As soon as he placed that shopping bag on the front seat I began to pull off. After moving for a few feet I saw several persons approach my car with weapons out and yelling police and for me to stop the car. I immediately stopped the vehicle. These officers approached both sides of the car and with their weapons pointed at me ordered me out of the vehicle and to the ground. I followed their instructions. I was handcuffed while laying on the ground next to the car.
>
> 4. After I was handcuffed I observed the officers open the doors of the Altima and begin to search the car. They went through the shopping bag that was on the front seat and I saw them recover two jackets and two packages from inside the shopping bag. The contents of the two packages were not visible. At no time was there a "brick" shaped package sitting on the front seat or front center console of the vehicle prior to the time that the vehicle was stopped by the officers and I was ordered out of the vehicle.

Because Funches (and the other defendants as well) rested without offering any testimony at the hearing, this Court has not considered that affidavit as a component of the substantive evidence before it for decision.

Rather this Court has independently discredited the agents'

testimony on the subject, not just because of the internal inconsistencies in that testimony but also because this Court has found it less plausible than the alternative. And the fact that the alternative was also set forth in the Funches affidavit does not operate to make it unworthy of belief.